Lord Appeal.

Argued May 25, 1951. Before DREW, C. J., STERN, STEARNE, JONES, BELL, LADNER and CHIDSEY, JJ.

*Paul M. Segal*, with him *Harry P. Warner, Leonard Boreman, Krause & Boreman*, and *Segal, Smith & Hennessey*, for appellant.

*E. V. Buckley*, with him *Mercer & Buckley*, for appellee.

OPINION BY MR. JUSTICE BELL, June 27, 1951:

Does the antenna mast which the petitioner-appellant intends to build in the back yard of his home and which is used for amateur radio communication violate the ordinance of the Borough of Munhall; and if so, does the ordinance violate the Fifth and Fourteenth Amendments to the Constitution of the United States, or the Constitution of Pennsylvania?

Appellant is a licensed amateur radio operator. He had for many years an antenna in and on top of his house; he operates his station solely for pleasure and wants to increase its efficiency so that he can communicate with more distant points and use less power. He proposes to erect in his back yard, which is 50 feet wide and 60 feet deep from the house to the rear boundary line, a mast *32 feet high*, with a 39 inch triangular base and a triangular top 12 inches on a side. The mast and beam antenna which it supports will be made of aluminum, set in a concrete base which will be placed 30 feet from his house, 23 feet from one lateral lot line and 27 feet from the other. The mast is self-supporting and will withstand a wind velocity in excess of 70 miles per hour. The court found that the proposed antenna will not appreciably interfere with radio reception by others; and that no question was raised as to the adequacy of the base or support, or as to the strength and durability of the mast.

Appellant applied for a permit to erect this mast in the rear yard of his premises. The permit was refused by the building inspector and on appeal by the Board of Adjustment. So far as the record shows, no testimony was taken by or before the Board of Adjustment. Appellant's application was "denied, as it violates the zoning code in a 'B' Residential District . . ." There were no findings of fact by the Board of Adjustment, and the return of the Board was so meagre that the Court of Common Pleas to which the appeal was taken properly took testimony as it was specifically authorized to do by the Act of July 10, 1947, P.L. 1621, §93, 53 P.S. §15211.7. The Borough Code provides: "Any person aggrieved by any decision of the board of adjustment, . . . may . . . appeal to the court of common pleas of the county by petition, duly verified, setting forth that such decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and specifying the grounds upon which he relies. . . . If upon the hearing of the appeal it shall appear to the court that testimony is necessary for the proper disposition of the appeal, *it may take evidence.* . . . *The court may reverse, or affirm, in whole or in part,* or may modify the decision appealed from *as it may appear just and proper.*"*

The Court of Common Pleas reversed the order of the Board of Adjustment and directed it to authorize the building permit. The Superior Court reversed the order of the Court of Common Pleas on the ground that the proposed antenna mast violated the Zoning Ordinance, and that the Board of Adjustment's decision was not a manifest abuse of discretion.** From this decision an appeal was taken to this Court.

* Italics throughout, ours.

** Cf. *Reininger Zoning Case*, 362 Pa. 116, 66 A. 2d 225.

All of the facts are undisputed; the difference of opinion arises from the inferences, deductions and conclusions which are drawn from the undisputed facts.

The question narrowly stated at the commencement of this opinion actually involves broad and fundamental rights of every property owner in the United States and the opposing right of a governmental body to restrict or destroy these rights. In England in ancient times land was holden of the King, whose power was supreme. As the King's power decreased and the power of his nobles increased, slowly the right, first of the nobles and then of every land owner to freely and absolutely own, possess and enjoy the land which he owned in freehold, became recognized by all as a sacred, absolute, inviolable right. It was considered a part of his fundamental liberty, a very important part of the fundamental law which was the supreme law of the land and which was called the Common Law because it was given to all in common.* A large part of the law in the Middle Ages was necessarily concerned with property. Over the centuries, statutes were enacted which declared and safeguarded the rights and ancient liberties of the people which had arisen by immemorial usage or custom "Whereof the memory of man runneth not to the contrary". *The principle of the sanctity of private property underlies* several articles of *Magna Carta.*

In the Industrial Age the pendulum slowly but surely turned backwards. Gradually the landowners' rights became less absolute, and the maxim of the Roman Law (Sic utere tuo ut alienum non laedas) to so use your own land as not to injure another, was adopted and became part of the common law of Eng-

---

* See "The Statute of York and the Interest of the Commons" by Professor George Lee Haskins, in which he traces the origin, development and supremacy of the common law.

land. This endless swaying struggle between the rights of a Sovereign and the rights of an individual was resolved in America by alloting to each certain rights, powers and boundaries. Both our Federal and State Constitutions provide for and *guarantee to every citizen* certain unalienable rights and liberties; and *with respect to property limit the paramount right of the Sovereign State to take an owner's land for a public use only,* and even then, only *if it pays the owner just compensation:* Fifth and Fourteenth Amendments to the Constitution of the United States; Article I, §10, Article XVI, §8, Constitution of Pennsylvania.

More recently, i.e., in the last 25 years, the swing of the pendulum in favor of sovereignty has been precipitated because of wars, a depression, and the complexities of modern life. This trend has taken the form of planning commissions and zoning boards, which have become very fashionable; and their acts, ordinances or regulations have tended to further restrict an owner's right in his own land.

While it is obviously true that the ancient adage of Coke (originally found in Staumford's "Pleas of the Crown" in 1557), that "A man's house is his castle", is, in the words of Rudyard Kipling "One with Nineveh and Tyre", an owner of property is still entitled in Pennsylvania to certain unalienable constitutional rights of liberty and property. These include a right to use his own home in any way he desires, provided he does not (1) violate any provision of the Federal or State Constitutions; or (2) create a nuisance; or (3) violate any covenant, retriction or easement; or (4) violate any laws or zoning or police regulations which are constitutional. It is now well settled that zoning acts and ordinances passed under them are valid and constitutional as structural or general legislation *whenever they are necessary for the preservation of public health, safety, morals or general welfare, and*

126

*not unjustly discriminatory, or arbitrary, or unreasonable, or confiscatory in their application to a particular or specific piece of property: White's Appeal, 287 Pa. 259, 134 A. 409; Taylor v. Moore, 303 Pa. 469, 154 A. 799; Kline v. Harrisburg, 362 Pa. 438, 451, 68 A. 2d 182; Jennings' Appeal, 330 Pa. 154, 198 A. 621; Ward's Appeal, 289 Pa. 458, 137 A. 630; Bryan v. City of Chester, 212 Pa. 259, 61 A. 894; Taylor v. Haverford Township, 299 Pa. 402, 149 A. 639; Perrin's Appeal, 305 Pa. 42, 48, 156 A. 305; Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S. Ct. 114; Penna. Coal Co. v. Mahon, 260 U.S. 393, 43 S. Ct. 158; St. Louis Poster Advertising Co. v. St. Louis, 249 U.S. 269, 39 S. Ct. 274; Eubank v. Richmond, 226 U.S. 137, 33 S. Ct. 76.*

Restrictions imposed by zoning ordinances are, however, in derogation of the common law and (at times) of the liberties, rights and privileges guaranteed by the Constitution of the United States and the Constitution of Pennsylvania and therefore must be strictly construed: *Lukens v. Zoning Board of Adjustment, 367 Pa. 608, 80 A. 2d 765; Kline v. Harrisburg, 362 Pa. 438, 451, 68 A. 2d 182.*

In the light of these principles we shall first examine the ordinance and the pertinent facts. The Ordinance (No. 960) of the Borough of Munhall was passed on January 13, 1942 and is as follows:

"ARTICLE V

"'B' Residence District.

"Section 400. In a 'B' Residence District, the following regulations shall apply.

"Section 401. A building may be erected, altered or used, and a lot or premises may be used for any of the following purposes:

(1) All uses permitted in an 'A' Residence District.

(2)  Accessory use on the same lot with and *customarily incidental to any of the above permitted uses and not seriously detrimental to a residence neighborhood,* including a private garage.

(3)  Minor or Community Garages."

The Act of July 10, 1947, P.L. 1621 §93, 53 P.S. §15211.3 provides (in part) : "Purpose in View . . . Such [zoning] regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout the borough."

We will immediately dispose of this Act by noting that there was no evidence that the erection of this antenna mast would devalue surrounding residential property. Thirty-four close neighbors of the appellant signed a petition stating that they did not object to the erection and operation of the antenna mast. It is reasonable to assume that they would not have signed or approved appellant's petition if they had believed that the value of their respective properties would have been substantially affected or decreased.

The importance of amateur radio in furthering science, in discovering the whereabouts of persons lost on land or sea, in furnishing and eliciting information of great value to our country, and in spreading goodwill throughout the world can hardly be exaggerated. Although there are only 90,000 amateur radio operators who have been licensed in America and 120,000 such operators in the world, the present and increasing importance of amateur radio is tremendous. Radio and Television (with their accompanying antennae) have become so popular that they are rapidly becoming a modern necessity. The records of the Federal Communications Commission show that there are 700 licensed amateurs in Allegheny County and 7,200 in the

Commonwealth. In this particular borough there was no evidence that any antenna or mast had been erected by an amateur radio operator.

The ordinance of the Borough of Munhall can be sustained in this case by holding, as the learned trial judge did, that the antenna and mast are a permitted accessory use within the meaning of the ordinance and not seriously detrimental to a residence neighborhood. The fact that 34 close neighbors approved the proposed construction demonstrates, we believe, that it is not seriously detrimental to this residential neighborhood. There was no evidence to establish that the structure would be unsightly, although it is probable that some people would consider it so. A home owner cannot be deprived by zoning of a right to use his own property as he wishes merely because a zoning board believes that what he intends to erect is not artistic or aesthetic: *Liggett's Petition,* 291 Pa. 109, 118, 139 A. 619; *White's Appeal,* 287 Pa. 259, 266, supra; *Miller v. Seaman,* 137 Pa. Superior Ct. 24, 8 A. 2d 415. Whether the antenna mast is an accessory use, customarily incidental to other uses permitted in an "A" residence district, is a close question. A similar but much smaller antenna had been erected and was in operation for many years in and on top of the petitioner's house without the slightest objection from anyone. In passing through numerous urban areas, one is impressed with the seemingly endless line of television antennae on nearly every house for mile after mile. Antenna for radio and television have become a part of the home of countless Americans in every economic strata of life.

Does the fact that this mast (and antenna) are considerably larger than the usual mast (and antenna) take it out of the permitted and customary uses? We believe that to so hold would place an unnecessary and unwarranted block in the road of progress and in the legitimate enjoyment of private property.

The Township Commissioners wish to protect and improve their community; they do not wish it to become unsightly or to have their property depreciate in value; and they believe both of these results would occur if a large number of property owners were permitted to erect similar or perhaps larger masts. They therefore posed at argument the question which is perplexing them and many other Commissioners: What are our powers and how far can we go? While that is a wise approach and a fair question, it is not within our province to give, in this case, more than a general answer. The zoning field is new and broad and many boundaries still remain to be defined.

Our forefathers came to America seeking Liberty— liberty of thought, of speech, of religion, and of freedom from interference with their property or lives. It was probably because of this historical origin and development of our Country and the rights, privileges and immunities guaranteed by our Constitution, some of which are apparently little known or ofttimes forgotten, that this Court in the leading case of *White's Appeal*, 287 Pa. 259, 134 A. 409, reviewed the power of a state to take or regulate the use of private property, as well as the difference between the police power and the power of eminent domain. The Court, in a clear and comprehensive opinion, reiterated certain fundamental principles and laid down certain guideposts to aid legislative bodies and zoning commissions in their consideration of prospective laws, ordinances or regulations which might affect the health, safety or welfare of a community on the one hand, and on the other hand, interfere with certain unalienable rights of every citizen. The legislative power is so well known and the constitutional rights of an individual are today so little known, that we shall quote only those parts of the Court's opinion which deal with the limitations of

legislative bodies and the corollary rights of citizens (pages 265, 266, 267) :

". . . all property is held in subordination to the right of its reasonable regulation by the government *clearly necessary* to preserve the health, safety or morals [or general welfare] of the people. . . . There is one matter that is quite certain, *the power to thus regulate does not extend to an arbitrary, unnecessary or unreasonable intermeddling with the private ownership of property, even though such acts be labeled for the preservation of health, safety and general welfare.* . . . While such regulations may not physically take the property, they do so regulate its use as to deprive the owner of a substantial right. therein *without compensation.* 'We are in danger of forgetting that a strong public desire to improve the public condition it not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change': Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 416. . . . 'To secure their property was one of the great ends for which men entered society. *The right to acquire and own property, and to deal with it and use it as the owner chooses so long as the use harms nobody, is a natural right.* It does not owe its origin to constitutions. It existed before them. *It is a part of the citizen's natural liberty,*—an expression of his freedom,—guaranteed as inviolate by every American bill of rights': Spann v. Dallas, 111 Tex. 350, 235 S.W. 513. . . . Each case must of course be decided on its own facts. . . . Where a statute or ordinance interferes with the use and control of property without rational relation to public safety, health, morals or general welfare, *or is a palpable invasion of rights secured by the fundamental law, the enactment cannot be sustained* as a legitimate exercise of police power. . . . To bring this, and other like regulations, under the police power, would be to sweep

away constitutional guarantees on the ownership of property. It is regulation run mad."

In the light of our construction of the ordinance in question, it is not necessary to further discuss or to decide whether this ordinance in its application to the petitioner's property violates the Constitution of the United States or the Constitution of Pennsylvania.

The decree of the Superior Court is reversed; the order or decree of the Court of Common Pleas of Allegheny County is reinstated; and the Board of Adjustment is directed to authorize and direct the issuance of a building permit to appellant in accordance with this opinion and with the decree of the lower court; each party to pay his or its respective costs.